**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 200439-U

Order filed September 26, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0439 Circuit No. 17-CF-524 |
| MARQUISE T. SABBS, | ) ) ) | The Honorable Clark E. Erickson |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justice Peterson concurred in the judgment.
Presiding Justice McDade dissented.

_____

**ORDER**

¶ 1     *Held*:  Defendant failed to establish that trial counsel's performance was deficient or that defendant was prejudiced based upon counsel's failure to object to purported hearsay testimony. The admission of other-crimes evidence did not amount to plain error. The trial court's failure to poll one of the jurors does not require reversal. Defendant's first degree murder, aggravated battery with a firearm, and aggravated discharge with a firearm convictions are affirmed.

¶ 2     Defendant, Marquise T. Sabbs, appeals his convictions for two counts of attempted first degree murder, two counts of aggravated battery with a firearm, and one count of aggravated

discharge of a firearm. Defendant asserts that: (1) his trial counsel rendered ineffective assistance by failing to object to purported hearsay testimony; (2) the admission of purported other-crimes evidence was plain error; and (3) the trial court's failure to poll all 12 jurors violated his right to a unanimous verdict. For the reasons set forth below, we affirm.

¶ 3                                                         I. BACKGROUND

¶ 4          On October 13, 2017, defendant was indicted on two counts of attempted first degree murder, two counts of aggravated battery with a firearm, one count of aggravated discharge of a firearm, and one count of unlawful possession of a firearm by a street gang member[1] for his role in gang-related shootings that occurred in Kankakee on August 27, 2017. The drive-by shootings injured 12-year-old K.B. and 18-year-old Darren Thrower.

¶ 5                                                    A. Pretrial Proceedings

¶ 6          Prior to the start of defendant's trial in the instant case, defendant was charged in a separate case (case No. 18-CF-279) with four counts of harassment of a witness, three counts of communicating with a witness, and four counts of conspiracy to commit harassment of a witness for attempting to influence the testimony of witnesses in the instant case. On February 8, 2019, defendant pled guilty to two of these counts—counts I and III, which charged Class 2 felony harassment of a witness. Specifically, count I alleged that, between August 28, 2017, and December 6, 2017, defendant,

> "with intent to harass or annoy Lupe Torres, an inmate at the Jerome Combs
> Detention Center who is serving as a witness, or who may be expected to serve as a
> witness in [the instant case], because of the testimony or potential testimony of [] Lupe

---

[1] Following the close of evidence at trial, the State dismissed the count for unlawful possession of a firearm by a streetgang member.

Torres, communicated indirectly with Lupe Torres in such manner as to produce mental anguish or emotional distress, in that [defendant] had other inmates deliver Kite's [*sic*] or notes and affidavits to Lupe Torres to try and change Lupe Torres's testimony."

In turn, count III alleged that, between August 28, 2017, and December 6, 2017, defendant,

"an inmate at the Jerome Combs Detention Center who, with intent to harass or annoy K.B., a minor who is serving as a witness, or who may be expected to serve as a witness in [the instant case], because of the testimony or potential testimony of [] K.B., communicated indirectly with[] Shernicka Johnson,[2] the mother of K.B., in such manner as to produce mental anguish or emotional distress, to Shernicka Johnson, in that [defendant] had other associates contact Shernicka Johnson to try and influence K.B.'s testimony."

¶ 7    Defendant was sentenced to concurrent three-year terms of imprisonment for the harassment of a witness convictions.

¶ 8        Thereafter, in the instant case, defendant filed motions *in limine* to exclude all evidence regarding, and any reference to, the harassment of a witness convictions. Defendant argued, "This motion is based upon the grounds that this activity arose subsequent to the above charge and was merely defendant[']s attempt to exonerate himself. Allowing evidence of a subsequent conviction to harass witnesses in this case would prejudice the defendant and cause jury confusion." The trial court denied the motion, noting that the evidence was admissible to show defendant's state of mind and consciousness of guilt in the instant case. The trial court also stated that "it comes in as an admission" in that defendant "pled guilty to conduct that is very

---

[2] Elsewhere in the record, Johnson's first name is spelled "Shernica."

3

specifically related to the testimony of witnesses against him in this case" and "the prejudicial value [] is certainly outweighed by the probative value."

¶ 9                                                    B. Trial

¶ 10          Defendant's jury trial commenced on January 28, 2020, and concluded on January 31, 2020. The State introduced testimony from several witnesses regarding the events that transpired on August 27, 2017. Daleisa Hampton, who knew defendant "because we lived down the street from each other," testified that she was working at a Kankakee Burger King on August 27, 2017, when a "commotion" broke out after defendant, Dezerrick Pitts (whom she knew "from school"), and another man whom she did not know entered. Hampton testified that "[t]hey had just got done finding David," although the fight was not inside the Burger King, and Hampton did not see the fight. Hampton further testified,

> "They just came up in there talked—yelling—cause they know—they know me. They—they know me because I'm cool with all them. They came in there looking for David. They asked where he was at all rowdy and stuff. My manager had called the police. A few people was in there saying that Marquise had a gun, but I didn't—."

¶ 11          At this point, the prosecutor interrupted, "Okay. Let me—let me slow you down," and then went through the events more thoroughly. Defendant, Pitts, and the third person came into the Burger King that day while Hampton was working behind the counter. They were "rowdy," "loud," "like being boys." Hampton explained that she did not personally see a gun and that, other than being loud, the three did not do anything else inappropriate inside the Burger King. The prosecutor then asked, "[W]hy would the manager call the police?," and Hampton answered, "Because they said Marquise had a gun." Defense counsel stated, "Objection, Judge to the they said." The State responded, "I'm not asserting it for the truth, Judge." The court sustained the

4

objection, ruling: "I'm going to strike it *** I don't know what they said means." The trial court then instructed the jury: "So when I say strike it, that is you're not to consider that as evidence in any way."

¶ 12    Hampton proceeded to testify that the three men were in the Burger King "[n]ot long, [f]or about 5 minutes" because "they knew that my manager was calling the police." They ran out the door, and the police arrived at the Burger King about three minutes later. Hampton confirmed on cross-examination that she never saw defendant with a gun.

¶ 13    Jennifer Spears testified that she was outside of a friend's house across the street from the Burger King at about 4 p.m. on August 27, 2017, when she saw three young men enter the restaurant after walking through an empty lot. She knew two of them—defendant and Pitts. About two minutes later, "they came right back out, and [defendant] was yelling and carrying on about something," but Spears "couldn't tell what he was saying." The three young men got into a compact, red, four-door car that had pulled into the parking lot while they were still inside, although defendant had continued to yell and pace and was the last to get into the car. The car then drove away, and four police cars arrived at the Burger King less than a minute later.

¶ 14    Latesia Wilson testified that she had known defendant for several years and was friends with Hampton and with David Barbee—also known as DJ. Wilson testified that, on the day of the shootings, she had been at the Burger King to pick up Hampton from work and, while she was waiting outside, DJ and Pitts engaged in a fistfight. After the fight, Wilson left with DJ and dropped him off at a store and then drove to her aunt's house where she called defendant from inside her car. Wilson initially testified that she heard about a shooting at around 4 p.m. or 5 p.m. that day, then called defendant because she "heard that he was looking for [her] at Burger King,"

and made the call about 15 to 20 minutes after leaving the Burger King. On cross-examination, Wilson testified that she called defendant prior to hearing about the shooting.

¶ 15 Wilson testified that she and defendant spoke for about a minute using the Facebook Messenger application. Wilson's friend recorded the conversation, which was published over defendant's objection. The recording revealed that the fistfight occurred after DJ saw a Facebook post by Pitts that upset Wilson because she believed it disrespected her murdered brother. In the call, Wilson stated that she heard from the "Burger King crew" that defendant was looking for her. Defendant responded that no one was looking for Wilson and that they "came up in there looking for David." Wilson stated, "[D]ude shouldn't have been dissin' my brother," after which defendant asked, "[B]ut did they have to jump him?" Wilson answered that it "wasn't even a jump" and he "should have gotten it worse." Defendant assured Wilson that "we got our licks back already anyways." Wilson asked, "What y'all do?" and "What happened?," to which defendant responded, "We just got down." Wilson further testified that defendant and Pitts were friends and that defendant was "always with Lupe [Torres]" in August 2017.

¶ 16 Torres had also been charged in the August 27, 2017, shootings but testified pursuant to a plea agreement. Torres had known defendant for over 10 years, having grown up in the same neighborhood. Torres further testified that he knew Hernan Carmona from the neighborhood and because their parents grew up together. Torres was a "future king" in the Latin Kings, of which defendant and Carmona were members, and was working toward becoming an official member.

¶ 17 On the day of the shootings, Torres, defendant, Carmona, and several other people were at Torres's house when Pitts stopped by and related being "jumped" at the Burger King a few blocks away by members of the Northsiders, a rival gang. The Northsiders and the Latin Kings were known to fight and exchange gunfire. Pitts is a member of the Mafia Vice Lords—a gang

6

friendly with the Latin Kings. After Pitts reported that DJ, who was a Northsider, had jumped him, Carmona, Pitts, defendant, and someone referred to as "Haynes" walked to the Burger King. Torres met them there in his red Volkswagen Jetta.

¶ 18    When he arrived at the Burger King, Torres saw defendant, Pitts, and Haynes nearby and drove around the block as the other men entered the restaurant. He later pulled into the parking lot and the other men got in the car, returning to Torres's house. Later, they dropped off Pitts at another location, and Torres, defendant, and Carmona returned to Torres's house, where they smoked marijuana. Sometime after that, Torres drove the men to a house where Carmona's cousin lived. At that time, Carmona was in the front passenger seat, and defendant in the rear driver's side seat. Defendant and Carmona were at that house for about five minutes before getting back into Torres's car. As they drove back through Northsider gang territory, a group of men started shooting at the car. In response, Carmona rolled down the window and began to fire back with a 9-millimeter gun and told defendant to do the same. Defendant opened the back passenger window and started to shoot, using a 32-caliber revolver. Carmona fired five or six shots at a blue house and ordered defendant to shoot at the house, too. Torres testified that defendant fired two or three times. Torres drove everyone back to his house and told them to get rid of the car.

¶ 19    When Torres was arrested on September 7, 2017, he agreed to cooperate with the police and waived his constitutional rights. Although initially lying to police by denying his involvement in the shootings, Torres later admitted his involvement and identified defendant and Pitts as the shooters. He claimed that he lied about Pitts being one of the shooters because he feared gang retaliation if he had identified Carmona, who held an important position in the Latin Kings as an "enforcer."

7

¶ 20    After Torres was charged in the case, he entered into a plea agreement in November 2017. He then told police that defendant and Carmona had been the shooters. He submitted to a videotaped statement in December 2017 and later agreed to testify for the State at defendant's trial. The plea agreement was entered into evidence. It provided that Torres would plead guilty to two counts of aggravated battery with a firearm in exchange for an aggregate sentence of nine years in prison. Under the agreement, Torres was required to testify truthfully about the shooting at trial, and the State agreed to drop an attempted first degree murder charge against Torres. While he was an inmate in the Kankakee jail, Torres received notes that he believed were sent by defendant. Those notes were admitted into evidence over defendant's objection.

¶ 21    Torres testified to the basis for his belief that defendant sent the notes. He believed that one of the notes was sent by defendant because "some Kings that we know brought it to me to sign an affidavit that was sent from [defendant] to them to give to me." The back of the note read, "to Lupe from Loko." Torres explained that he was known as "Lupe," and defendant was known as "Loko." The note stated,

> "Wassup bro? I heard you over there with Flocka. Tell em I said wassup. When they trying to send you back to court? I go on the 31st. They trying to sit us down. We gotta come up with some quick 100. What's been going on tho? I still got Nija number, but I ain't know if you was f *ckin wit me or not. I been trying to get ahold of you and her. Let me know sum. I got some for us. Write me back ASAP so I can call her and tell her wassup with everything and so she can let you know."

Torres explained that Nija was his girlfriend and that "get up some quick 100" expressed defendant's intent to contact her.

8

¶ 22    The State also admitted an affidavit that Torres had been told to rewrite in his own handwriting, sign, and send back to defendant's trial counsel. Torres received the affidavit from a Latin King member from the neighborhood who shared the same jail pod. A second affidavit was also admitted into evidence. It contained a notation that it had been sent from Loko to Torres. Torres received that affidavit through a Latin King member in his pod, who also informed him that it was from Loko. Torres was again instructed to return the signed affidavit to defendant's trial counsel.

¶ 23    On cross-examination, Torres admitted that he had a .9-millimeter casing in his pocket when he was arrested, but he claimed it was unrelated to this case. He also acknowledged that he had testified for the State in a 2018 gun case against Carmona related to these shootings. He further acknowledged that the police recovered a .32-caliber revolver from Haynes, not defendant.

¶ 24    Both shooting victims, K.B. and Thrower, testified. K.B. testified that she was shot at her home while sitting on her back porch doing homework and that Thrower was also on the back part of the porch near the alley. Before the shootings, K.B. saw a red car twice drive down the alley by the porch, slowing down the second time. When the car appeared a third time, the shots were fired, hitting K.B.'s left leg. She spoke to the police at the hospital and then at her aunt's house after being discharged. During the second interview, she reviewed police photos to try to identify the men involved, but the man she identified was not defendant. However, K.B. testified that she told police that she saw "Lupe" driving the car and "Hernan" inside the car.

¶ 25    Thrower testified that he was outside his brother's Kankakee house on the day of the shootings. Although Thrower stated he was unable to independently recall the events, he remembered speaking to police while in the hospital after he was shot. Thrower had reviewed the

9

tape-recording of his interview, which was published over defendant's objection. In the recording, Thrower described standing outside his friend's house when a red Volkswagen came past shooting at one destination down the block from Thrower, then shooting at Thrower's location. Thrower further stated in the recording that "everybody was in there like four deep" and there were two shooters—one in the front passenger seat and one directly behind in the back passenger seat. Thrower proceeded to testify that he was shot in the right wrist and right outer thigh and that he did not see who fired the shots.

¶ 26 City of Kankakee Detective Lacy Zingre testified that she was patrolling on August 27, 2017, when she responded to a call of shots fired. After finding shell casings at the scene, she left the scene to help another officer. While driving away, she noticed and recognized defendant, who was standing in a lot. Defendant came to her attention because the lot was located in a rival gang's territory, making his presence there "uncommon." Zingre knew that defendant was a Latin King, whose territory was on the opposite side of town, and she was also familiar with Carmona and Pitts.

¶ 27 An Illinois State Police firearm analyst testified that he had conducted a microscopic examination of eight .9-millimter fired cartridge cases from the shooting scene. He concluded that three of the casings were fired from one firearm and five were fired from a different firearm.

¶ 28 The State also introduced a certified copy of defendant's convictions for harassment of a witness in case No. 18-CF-279 and published the charges set forth in counts I and III, to which defendant pled guilty. In relation to the charges, K.B.'s mother, Shernica Johnson, testified in the instant case regarding threats aimed at her and K.B. when they were at the courthouse to testify in the instant case at an earlier court date on January 14, 2019. Defense counsel objected on the basis that the testimony was a surprise to him. The State responded that the testimony pertained

to the witness harassment charges to which defendant pled guilty. The trial court overruled the objection.

¶ 29    Johnson proceeded to testify that, while she and K.B. were in the courtroom at the earlier court date, Johnson noticed two nearby men staring at her. While the men stared at her, they were commenting that "nobody was going to tell on Marquise" and "[h]e was going to beat the case." At this point, defense counsel objected and moved to strike the testimony. After the trial court stated, "I don't know who said this," the prosecutor asked Johnson, "Who said this?" Johnson responded, "Your Honor, the defendant that's sitting in the back of the courtroom." The prosecutor then questioned, "Not the defendant in court today, but some other individuals?" Johnson responded that she did not know if they were in the courtroom because she could not see but that it looked like she was "seeing the defendants that was here that day." At that point, the trial court stated that it was going to strike the testimony; however, the prosecutor stated that "it's tied up," and the trial court agreed provided the prosecutor could "tie it up."

¶ 30    The prosecutor continued to question Johnson regarding what was said by the individuals in the courtroom on January 14, 2019. In response, Johnson testified that they were "talking to each other about the case and that nothing was gonna—he was gonna beat the case. Wasn't nothing gonna happen. Wasn't nobody gonna testify." Johnson further testified that, while making those comments, one of the individuals made a gun motion with his fingers. Although the men appeared to be talking between themselves, Johnson believed they were also talking to her because they maintained steady eye contact with her the entire time. The men's comments scared K.B., causing Johnson to go to the State's Attorney's office, where the men were identified as Salvador Rosus and Martin Carmona. The bailiff thereafter removed the two men from the courtroom at that prior court date.

11

¶ 31    Johnson further testified that the same two men were again in the courtroom and identified their location in the gallery. On cross-examination, defense counsel questioned Johnson as to whether she thought those same two individuals were in the courtroom that day, and Johnson responded affirmatively. The trial court then granted defense counsel's request to have the two individuals whom Johnson identified in the gallery stand up and state their names. The record reflected confusion over whom Johnson identified, at which point three individuals in the gallery identified themselves—Victor Andrade, Alex Andrade, and Martin Carmona (and not Salvador Rosus). At the conclusion of Johnson's testimony, defense counsel moved to strike the testimony, which the trial court denied. Subsequently, during a trial recess and outside the jury's presence, the three individuals were removed at the trial court's direction and banned from the courthouse.

¶ 32    The State also introduced the testimony from the chief of corrections at the Kankakee County jail regarding the jail's phone system, how it recorded inmates' calls, and that those recordings were kept in the ordinary course of police business. A one-page call detail report including information such as the date, time, number called, length of call was also admitted and published to the jury over defendant's objection. The chief of corrections confirmed that the outgoing calls had been made from the jail using defendant's pin number. A disc of defendant's recorded calls dated September 19, 2017, September 24, 2017, September 27, 2017, October 7, 2017, October 16, 2017, and October 31, 2017, was admitted as exhibit No. 35. The State played approximately 20 minutes of clips from those recordings to the jury.

¶ 33    In the clips, defendant made inculpatory statements concerning witness harassment. For instance, defendant was heard to say, "It wasn't him (some other person) that snitched, it was some little girl with the initials KB," and recounting that he had told another inmate that "[t]he

12

only thing I got to do is get to the little girl." In another call, defendant stated that he had heard "through the grapevine" that "it was Lupe" and in a subsequent call added, "Try to get him to change his statement, *** That way when I show up in court there's going to be a reasonable doubt. Like, why the f*** you changing your statement?" Defendant proceeded to instruct the person on the line, "Tell him Loko understands you have to do what you have to do, but just change your statement, and be like 'he wasn't with you' type sh**."

¶ 34     A subsequent call involved efforts to influence someone other than Torres or K.B. Defendant asked the person he called, "You couldn't find him?," and the person responded that he found him but it was an old profile. Defendant then instructed to "[t]ry to find Donnie," and when the person "found his Facebook," defendant advised, "Don't say it's me talking. You gotta say, 'Man, bro, woo woo, that sh** that happened with your little brother and them, that was all Lupe, that wasn't Loko—he ain't had sh** to do with that. Lupe and Loko got into it so Lupe's holding a grudge on Loko ****." Defendant continued, "Have them come to court and say they seen who it was, and it was Lupe and not me." Defendant can further be heard, advising, "Be like, Loko wasn't even with him that day. Loko was out of town, he wasn't even with him. They got into it, and he was holding a grudge on Loko." In a final call, defendant stated that "I need you all to stand up on that for me. Because when it's time to go to trial, I gotta make sure they don't even come to court for me, or if they do, they gotta set the record straight, like it wasn't me type sh**."

¶ 35     The defense called Hernan Carmona, who testified that, on the day of the shootings, he was driving around with Torres but did not remember whether defendant was present. Carmona acknowledged pleading guilty to a charge related to the shootings of K.B. and Thrower.

13

¶ 36   Following closing arguments, the trial court read the jury instructions, which included, *inter alia*, the following instruction:

> "Evidence has been received that the defendant has been involved in an offense and conduct other than which that was charged in the indictment.
>
> This evidence has been received on the issues of the defendant's intent, motive, knowledge, and state of mind and may be considered by you only for that limited purpose—or those limited purposes.
>
> It is for you to determine whether the defendant was involved in those offenses and conduct and, if so, what weight should be given to this evidence on the issues of defendant's intent, motive, knowledge, and state of mind."

¶ 37   During deliberations, the jury requested the recording of the calls defendant made from jail and a transcript of the conversations. The trial court sent the recordings to the jurors, informing them that no transcripts were available. The jury returned a verdict of guilty against defendant on all charges. At defense counsel's request, the trial court polled the jury, though the court failed to ask 1 of the 12 jurors about his verdict.

¶ 38                                    C. Posttrial Proceedings

¶ 39   Defendant timely filed a motion to vacate his conviction or for a new trial (and a supplemental motion), claiming that the State had not tendered the discs of defendant's recorded jail calls, that the recordings had no probative value, and that the trial court erred by allowing the jury to listen to those recordings during deliberations with a different speaker that improved the quality of the recordings. Following argument, the trial court denied defendant's motion. After a sentencing hearing, on October 21, 2020, the trial court sentenced defendant to two concurrent

prison terms of 13 years on the attempted first degree murder counts, and the other counts were merged into those convictions. Defendant timely appealed.

¶ 40                                   II. ANALYSIS

¶ 41        On appeal, defendant argues: (1) trial counsel provided ineffective assistance by failing to object to Hampton's testimony regarding comments that defendant had a gun at the Burger King; (2) the trial court committed plain error by admitting purported other-crimes evidence pertaining to the witness harassment convictions; and (3) the trial court's failure to poll 1 of the 12 jurors denied defendant his fundamental right to ensure that the verdict against him was unanimous. We address each argument in turn and affirm for the reasons set forth below.

¶ 42                              A. Hearsay Challenge

¶ 43        Defendant argues that Hampton's testimony that people in the Burger King said defendant had a gun was inadmissible hearsay. Thus, according to defendant, trial counsel performed deficiently by objecting only to Hampton's second reference to the statements and failing to object to her initial reference to the statements. Ineffective assistance of counsel claims are evaluated under the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668, 684-86 (1984). To prevail on an ineffective assistance of counsel claim, a defendant must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defendant in that there is a reasonable probability that the result of the proceeding would have been different. *People v. Jackson*, 2020 IL 124112, ¶ 90. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Defense counsel has wide latitude in making tactical decisions, and there is a presumption that counsel's conduct was the product of sound trial strategy. *People v. Ramsey*, 239 Ill. 2d 342, 433 (2010). The defendant must satisfy both prongs

15

under *Strickland*; thus, the failure to establish either is fatal to the claim. *Jackson*, 2020 IL 124112, ¶ 90. We review an ineffective assistance of counsel claim *de novo*. *People v. Webb*, 2023 IL 128957, ¶ 23.

¶ 44        Defendant's ineffective assistance claim centers on Hampton's testimony that people in the Burger King said defendant had a gun. While defendant argues that the statement was inadmissible hearsay, the State maintains that the statement was not hearsay because it was not offered to prove the truth of the matter asserted. See Ill. R. Evid. 801(c) (eff. Oct. 15, 2015) (defining "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Rather, according to the State, the testimony was elicited to explain why the Burger King manager called the police despite the men being rowdy and loud but otherwise not doing anything inappropriate. Indeed, the State points out that its theory of the case did not include defendant having a gun at the Burger King.

¶ 45        The State further argues that the record buttresses its characterization of the statement as not hearsay. Namely, trial counsel's objection to Hampton's second reference to the statement—"Objection, Judge to the they said"—and the trial court's ruling—"I'm going to strike it *** I don't know what they said means"—were based upon lack of foundation, not hearsay, notwithstanding the prosecutor's response to the objection—"I'm not asserting it for the truth, Judge." Accordingly, the State argues that, since the statement was not hearsay, defense counsel was not ineffective for failing to object to Hampton's initial reference to the statement. See *People v. Griffin,* 2022 IL App (1st) 190499, ¶ 40 ("Statements offered for their effect on the listener or to explain the subsequent course of conduct of another person are not hearsay."

16

[citation] As this was not hearsay, defendant's counsel was not ineffective for withholding objection to this testimony").

¶ 46    Accepting for the sake of analysis that the statement was inadmissible hearsay, the pivotal point is that the trial court in fact *sustained* defendant's objection and struck Hampton's testimony that "they said Marquise had a gun." More critically, the trial court then instructed the jury, "So when I say strike it, that is you're not to consider that as evidence *in any way*." (Emphasis added.) Defendant, however, reverts to Hampton's initial reference to essentially the same statement in her testimony that "[a] few people was in there saying that Marquise had a gun." According to defendant, defense counsel's performance may still be considered deficient because counsel did not object to this initial testimony. This argument lacks merit.

¶ 47    The record reflects that Hampton had initially volunteered the account as she was recounting defendant's arrival to the Burger King that day. The State interrupted to "slow [Hampton] down" and proceeded to elicit Hampton's testimony regarding the events of the day more thoroughly. Shortly thereafter (within three transcript pages as reflected in the report of proceedings), Hampton made the second reference to the statements, and, as discussed, defense counsel objected, and the trial court struck the testimony and instructed the jury not to consider the testimony "in any way." If the jury could not consider Hampton's testimony that "they said Marquise had a gun" in any way, then it certainly could not consider Hampton's testimony that "[a] few people was in there saying that Marquise had a gun." To hold otherwise would be illogical and would ignore the well-established legal principle that jurors are presumed to follow the trial court's instruction. See *People v. Taylor*, 166 Ill. 2d 414, 438 (1995) ("The jury is presumed to follow the instructions that the court gives it."). Moreover, a jury is capable of applying an instruction to more than one instance of similar testimony (see *People v. Darr,* 2018

17

IL App (3d) 150562, ¶ 60), particularly here, where the same testimony is given by the same witness within a very short time period. Accordingly, defense counsel's objection to Hampton's testimony prevented the jury from considering the challenged statement, and there is no reasoned basis upon which to hold that counsel's performance was deficient under the circumstances.

¶ 48    In addition to defendant's failure to establish the first prong of the *Strickland* test, defendant also failed to establish that the alleged deficient performance prejudiced defendant in that there is a reasonable probability that the result of the trial would have been different. See *Jackson*, 2020 IL 124112, ¶ 90. Initially, the trial court's admonition to the jury not to consider the evidence in any way cured any purported prejudice to defendant. *People v. Daniel,* 2022 IL App (1st) 182604, ¶ 136 (any prejudice from testimony that was given in violation of a pretrial order was cured when the trial court sustained the objection and admonished the jury to disregard the improper statement).

¶ 49    Moreover, the testimony was not significant in the context of the entirety of the evidence presented at trial. Torres testified that defendant and Carmona both fired shots while he drove, and his testimony corroborated Thrower's (one of the shooting victims) statement that two people were shooting out of a red Volkswagon. Spears, who was at a friend's house across the street from the Burger King, corroborated other testimony that defendant was at the Burger King prior to the shootings as well as Torres's testimony that he picked up defendant and two other men from the restaurant in a compact, red, four-door car. The jury also heard the recorded conversation between defendant and Wilson which confirmed that the men went to the Burger King to find "David," who had allegedly "jumped" a person earlier in the day. In the recorded conversation, defendant also told Wilson not to worry because "[w]e got our licks back already anyway." Detective Zingre testified that she saw defendant in a nearby lot after being dispatched

18

to investigate a report of shots fired and that defendant's presence there was "uncommon" because the lot was in rival gang territory. And finally, the evidence demonstrated that defendant exhibited consciousness of his own guilt in trying to influence witness testimony. Accordingly, defendant failed to establish the requisite prejudice pursuant to the second prong of the *Strickland* test. In sum, we reject defendant's ineffective assistance of counsel claim.

¶ 50                                    B. Other-Crimes Evidence

¶ 51        Next, defendant argues that the trial court abused its discretion in admitting purported other-crimes evidence, including Torres's testimony regarding the notes and affidavits defendant sent to him, the recordings of defendant's phone calls from jail in which he can be heard attempting to influence witnesses, and Johnson's testimony regarding the men who threatened K.B. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith ***." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). However, evidence of other crimes may generally be admitted "to prove motive, intent, identity, absence of mistake, *modus operandi*, or any other relevant fact other than propensity." *People v. Vannote*, 2012 IL App (4th) 100798, ¶ 37. Even if offered for a permissible purpose, other-crimes evidence will not be admitted if its prejudicial effect substantially outweighs its probative value. *People v. Dabbs*, 239 Ill. 2d 277, 284 (2010). Where properly preserved, we review a trial court's decision to admit other-crimes evidence for an abuse of discretion. *Id.* However, defendant acknowledges that he forfeited the issue by failing to object at trial and raise the issue in a posttrial motion but asserts that we should consider his argument under the plain error doctrine and that trial counsel was ineffective for failing to preserve the issue.

¶ 52        A reviewing court may address a forfeited claim pursuant to the plain error doctrine in two circumstances: " '(1) where a clear or obvious error occurred and the evidence is so closely

19

balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error and (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Logan*, 2024 IL 129054, ¶ 53 (quoting *People v. Belknap*, 2014 IL 117094, ¶ 48). The first step in applying the doctrine is to determine whether error occurred. *Id.*

¶ 53     Here, in denying defendant's motion *in limine* to exclude all evidence regarding, and any reference to, defendant's witness harassment convictions, the trial court reasoned that the evidence was admissible to show defendant's statement of mind and consciousness of guilt. Defendant does not challenge this ruling. Instead, he contends that, while the admission of his certified conviction for two counts of witness harassment in case No. 18-CF-279 and the charges to which he pled guilty "may have been proper to show his consciousness of guilt," publishing the charges to which he pled guilty "was all that was necessary to illuminate the issue for which the other crimes was introduced ***." According to defendant, the volume of additional other-crimes evidence admitted was unfairly prejudicial and deprived him of a fair trial. We disagree.

¶ 54     As the State argues, the evidence concerning defendant's attempts to influence witnesses was not just other-crimes evidence; it was circumstantial evidence of defendant's guilt in this matter, as it demonstrated consciousness of guilt. Evidence that a defendant tried to intimidate a witness is " 'indeed evidence [] of consciousness of guilt from which an inference can be drawn that the defendant is guilty of the offense charged.' " *People v. Abernathy*, 402 Ill. App. 3d 736, 753-54 (2010) (quoting *People v. Smith*, 3 Ill. App. 3d 958, 960 (1972)). Here, the challenged evidence was prejudicial to defendant only because it implicated him in the charged crimes. Any evidence that implicates a defendant is necessarily prejudicial to his defense. *People v. Gordon*,

20

2017 IL App (3d) 140770, ¶ 25 ("[A]ll evidence is prejudicial in that it is intended to impact the fact finder's decision. Why would anyone put on evidence at trial that did not prejudice the opponent's case?").

¶ 55        Contrary to defendant's argument, the evidence was not *unfairly* prejudicial. See *People v. Woodson*, 2023 IL App (1st) 191353, ¶ 101 ("Evidence is *unfairly* prejudicial when it casts a negative light on a defendant for reasons that have little to do with the case on trial.") (Emphasis added.). Defendant himself acknowledges that "the testimony of Torres and Johnson, as well as the documentary exhibits and recordings of the jail calls, all contained some additional details about the same conduct described in the charges in [case No. 18-CF-279]," but nonetheless contends that publishing the charges to which he pled guilty was all that was necessary. However, the substance of the charges in count I to which defendant pled guilty merely relayed that defendant had other inmates deliver kites, notes, and affidavits to Torres to try to change his testimony. Lacking was the context necessary to connect those offenses to the instant case, including the content of the documents defendant had delivered to Torres, the manner in which defendant attempted to influence the testimony, and defendant's connection to the documents that came from "other inmates." Further, the recordings of the jail calls reflected all the other ways defendant tried to influence witness testimony, and not just that of Torres and K.B. See *People v. Rios*, 2022 IL App (1st) 171509, ¶¶ 64-65, 68 (letters whose "theme" was the "defendant's acknowledgment of the offense and attempting to find a way to get someone else to take responsibility for it or to minimize his involvement in it" were properly admitted to establish a connection between the defendant and relevant events and show consciousness of guilt). Defendant also takes issue with the recordings being sent to the jury room, but the trial court acted well within its discretion in doing so. See *People v. Reynolds*, 2021 IL App (1st)

21

181227, ¶¶ 27-28, 68, 74 (rejecting the defendant's challenge to allowing the jury to view a recording in the courtroom in the presence of both parties and the trial judge where technical difficulties did not allow for viewing in the jury room).

¶ 56    In addition, like the substance of the charges in count I, the substance of the charges in count III to which defendant pled guilty merely relayed that defendant "had other associates" contact Johnson to try to influence K.B.'s testimony. The language provides no explanation as to how exactly defendant sought to intimidate K.B. from attending trial or testifying truthfully. Thus, the facts underlying the charge are critical to the jury's understanding of defendant's consciousness of guilt. Johnson's testimony provided the context, including who the associates were, how they contacted Johnson, and what they said. In her testimony, Johnson explained that defendant used two associates who came to court, stared at Johnson, and in earshot of Johnson and K.B. stated that defendant "was gonna beat the case," "[w]asn't nothing gonna happen," [w]asn't nobody gonna testify," while one of the men made a gun motion with his hand.

¶ 57    Ultimately, we disagree with defendant's characterization of the other-crimes evidence as repetitive and redundant. The record reflects the significant probative value of the evidence in providing the jury with a picture of what occurred after the crimes in the instant case indicating defendant's consciousness of guilt. The amount of evidence introduced was not unfairly prejudicial and did not, as defendant suggests, become the focal point at trial. To the contrary, as the State points out, the challenged evidence—a small portion of Torres's testimony, 20 minutes of recorded phone calls, and Johnson's testimony—was slight in the context of the week-long trial that included the testimony of 12 witnesses over multiple days and the introduction of 36 exhibits. Moreover, simply put, the amount of evidence introduced to show defendant's consciousness of guilt stands in direct correlation to the numerous ways in which defendant

22

attempted to influence witness testimony rather than some sort of "piling on" of duplicative evidence.

¶ 58      Defendant maintains that the purported prejudice to him was exacerbated by the fact that a limiting instruction was given only at the end of trial and not when the other-crimes evidence was introduced. However, it is well established that the failure to give a limiting instruction at the time the evidence is introduced does not mandate reversal (see *People v. Heard*, 187 Ill. 2d 36, 60-61 (1999)); indeed, reversible error does not automatically result even where a limiting instruction was never given (see *People v. Peel*, 2018 IL App (4th) 160100, ¶ 52). Defendant also takes issues with the wording of the limiting instruction given in this case—that the "evidence has been received on the issues of the defendant's intent, motive, knowledge, and state of mind and may be considered by you only for that limited purpose—or those limited purposes." Defendant argues that, while " 'intent, motive, knowledge, and state of mind' might be thought to encompass a consciousness of guilt, these limiting purposes were arguably much broader and not clearly applicable." However, assuming for the sake of analysis that the instruction was overly broad, the instruction aptly ensured that the jury did not consider the evidence for propensity purposes, and the State properly limited its argument regarding the evidence to consciousness of guilt. Moreover, the limiting instruction mitigated any purported prejudicial effect. See *People v. Young*, 381 Ill. App. 3d 595, 601 (2008) ("A limiting instruction reduces any prejudice created by admitting other-crimes evidence.").

¶ 59      Finally, defendant's challenge to the identification of defendant's "associates" in open court in front of the jury must be evaluated in the context of Johnson's attempt to explain how defendant used the associates to intimidate her and K.B. A review of the record demonstrates a certain amount of confusion as Johnson attempted to let the State and everyone else know that

23

she believed defendant's associates were again in the courtroom. As Johnson began to explain the earlier intimidation attempt, the defense objected and requested a sidebar. At the sidebar, the State established that the testimony related to the harassment of a witness count to which defendant pled guilty, and the trial court overruled the objection. Johnson's testimony resumed, and she stated, "They was mentioning that nobody was going to tell on Marquise. He was going to beat the case." Defendant objected without articulating the basis and moved to strike. The trial court asked the prosecutor, who in turn asked Johnson, "Who said this at that time?" It was in response to this foundational inquiry that Johnson then attempted to let everyone know that she believed these individuals who said this a year prior were in the back of the courtroom as she was testifying. However, no one seemed to grasp Johnson's continued attempts to explain that defendant's associates were again in the courtroom. The State concluded its direct examination with a leading question providing the names of defendant's associates who intimidated her to satisfy any foundation concerns. Johnson responded, "Yes sir *** sitting right there."

¶ 60    It was at this point that the State realized that Johnson was indicating that defendant's intimidation associates were present in the courtroom, and the State asked, "[D]o you happen to see those two individuals in court today?" From here, the State, the trial court, and defendant engaged in an examination of Johnson and interacted with these associates in the gallery, all in the presence of the jury.

¶ 61    Johnson's attempts to let everyone know the associates were present in the courtroom took place in the context of attempting to satisfy the foundational objections being raised by defendant. Once these individuals were identified by Johnson at the State's request, the remaining interactions that ensued were, for the most part, prompted by defendant. Defense counsel seemingly believed that these were not the same individuals and presumably wanted to

24

discredit Johnson's testimony by demonstrating as much. And indeed, defendant appears to have partially succeeded, *i.e.*, one of the two people in the courtroom was incorrectly identified by Johnson. With that the jury was excused and all subsequent interactions with these individuals took place outside the presence of the jury. When the jury returned, the individuals identified by Johnson were no longer in the courtroom. Unbeknownst to the jury, they had been barred from the courthouse for the remainder of the trial.

¶ 62 Certainly, one can imagine how some of what transpired related to the identification testimony might have occurred outside the presence of the jury. However, no trial is perfect, and a defendant in a criminal case is entitled to a fair trial, not a perfect one. *People v. Bull*, 185 Ill. 2d 179, 214 (1998). Critically, too, the State did not allude to these facts in any way at closing and did not argue that defendant was again attempting to intimidate Johnson and K.B. by using the same associates in the courtroom.

¶ 63 In sum, the challenged other-crimes evidence was highly probative of consciousness of guilt and provided the context for defendant's witness harassment convictions as well as additional attempts to influence witnesses, and the high probative value was not outweighed by the risk of unfair prejudice. Accordingly, defendant cannot establish error for purposes of the plain error doctrine or that trial counsel was ineffective for failing to preserve the issue. In addition, given our analysis set forth above, we reject defendant's final contention that the cumulative effect of the alleged erroneous admission of Hampton's purported hearsay testimony and the alleged erroneous admission of other-crimes evidence necessitates a new trial.

¶ 64 C. Jury Polling

¶ 65 Lastly, defendant argues that the trial court's failure to poll one of the jurors warrants reversal and remand for a new trial. He acknowledges that trial counsel did not preserve the issue

25

for appeal but contends that the error is reviewable as second-prong plain error. The State concedes that the error occurred but argues that our supreme court's recent decision in *People v. Jackson*, 2022 IL 127256, precludes relief. We agree. In *Jackson*, the court explicitly held that the inadvertent failure to poll 1 of 12 jurors is not second-prong plain error. *Id.* ¶ 73. In his reply brief, defendant concedes that, after *Jackson*, the polling error is not subject to review under the second prong of the plain error doctrine but argues that we should review the issue under the first prong of the plain error doctrine. However, for the reasons outlined above, the evidence in this case was not closely balanced given the entirety of the evidence presented at trial. Thus, defendant cannot establish first-prong plain error.

¶ 66                                III. CONCLUSION

¶ 67        For the reasons stated, we affirm the judgment of the circuit court of Kankakee County.

¶ 68        Affirmed.

¶ 69        PRESIDING JUSTICE McDADE, dissenting:

¶ 70        Because I believe the cumulative effect of the trial errors in this case create first prong plain error, I respectfully dissent from the majority's order. My first point of disagreement involves defendant's claim that his defense counsel provided unconstitutionally ineffective assistance by failing to object to testimony offered by Daliesa Hampton.

¶ 71                        A. Ineffective Assistance of Counsel

¶ 72        Defendant contends that his right to effective assistance of counsel was violated when his defense attorney failed to object to hearsay statements made during Hampton's testimony for the State. In that testimony, Hampton recounted hearing other, unidentified, people say defendant had a gun prior to the shootings when he was present in the Burger King where she was working. He argues that his trial counsel's lack of objection to that hearsay testimony fails the two-prong

26

test for ineffective assistance established in *Strickland*, 466 U.S. at 684-86, and adopted in Illinois in *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984). Under the *Strickland* test, criminal defense counsel is deemed to have rendered constitutionally ineffective assistance if the defendant can successfully demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) but for those errors, a different outcome was reasonably probable. *Strickland*, 466 U.S. at 687; *People v. Eubanks*, 2021 IL 126271, ¶ 30.

¶ 73    Defendant contends that his counsel's performance was deficient when he objected to only Hampton's second reference to the statements of others that she overheard about defendant having a gun while at the Burger King and failed to object to her initial reference to those statements. He argues that because Hampton's testimony constituted inadmissible hearsay, counsel's failure to object fell below an objective standard of professional reasonableness.

¶ 74    The State disputes defendant's characterization of Hampton's testimony as hearsay, maintaining that it was not hearsay because it was not offered to prove the truth of the matter asserted. See Ill. R. Evid. 801(c) (eff. Jan. 1, 2011) (defining "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). Instead, the State asserts that the testimony was elicited to explain why the manager of the Burger King called the police. In the State's view, defense counsel was not ineffective for failing to object to Hampton's testimony because it was not inadmissible hearsay. See *People v. Griffin*, 2022 IL App (1st) 190499, ¶ 40 (stating "[a]s this was not hearsay, defendant's counsel was not ineffective for withholding objection to this testimony").

¶ 75    The trial record establishes that Hampton's initial reference to defendant's alleged possession of a gun occurred while recounting how he and two other men entered the Burger

27

King where she was working. "They just came up in there talked—yelling—cause they know—they know me. *** They came in there looking for David. They asked where he was at all rowdy and stuff. My manager had called the police. A few people was in there saying that [defendant] had a gun but I didn't—." The prosecutor then interrupted Hampton *to slow down her testimony*. After further questioning by the State, Hampton denied personally seeing defendant with a gun that day, but, during its subsequent questioning, she again mentioned hearing that defendant had a gun:

> "MR. LAWS [(ASSISTANT STATE'S ATTORNEY)]: *** [W]hy would the manager call the police?
>
>> HAMPTON: Because they said Marquise had a gun.
>>
>> MR. LAWS: Okay.
>>
>> MR.RIDGE [(DEFENSE COUNSEL)]: Objection, Judge to the they said.
>>
>> MR. LAWS: I'm not asserting it for the truth, Judge.
>>
>> THE COURT: Well, I—yeah, I'm going to—I'm going to strike it.
>>
>> MR. LAWS: Okay.
>>
>> THE COURT: I don't know what they said means.
>>
>> MR. LAWS: So how long were they inside the Burger King?
>>
>> THE COURT: So when I say strike it, that is you're not to consider that as evidence in
>
> any way."

¶ 76      The trial transcript fails to support the State's claim that Hampton's first reference to statements made by unidentified individuals was intended to explain the call to the police. Read in context, the first reference came as Hampton was loosely narrating the men's arrival at the Burger King, not as a rationale for the manager's call. Immediately prior to noting that call, she

28

described the men's behavior as "all rowdy and stuff," behavior which could arguably justify a call. Only after that did Hampton note that "[a] few people was in there saying that [defendant] had a gun" before being interrupted by the State. A reasonable reading of Hampton's testimony leaves the enduring impression that others saw defendant with a gun shortly before the shootings. Thus, it was hearsay, and defense counsel erred by failing to object to it.

¶ 77     That conclusion is bolstered by defense counsel's immediate hearsay objection when Hampton again testified to others seeing defendant with a gun in response to the State's direct question about why the manager called the police. Although the State asserted that her testimony was not intended to prove defendant's gun possession, the trial court recognized that the highly inculpatory statements were hearsay tying defendant to a gun shortly before the shootings and struck that portion of Hampton's testimony. The possibility that those statements improperly influenced the jury's verdict was the same each of the two times time that Hampton referred to others seeing defendant with a gun.

¶ 78     To provide effective assistance, trial counsel has a duty to keep damaging evidence out of court and away from the jury. " 'The constitutional guarantee of effective assistance of counsel requires a criminal defense attorney to use the applicable rules of evidence to shield his client from a trial based upon unreliable evidence.' " *People v. Othman*, 2019 IL App (1st) 150823, ¶ 72 (quoting *People v. Fillyaw*, 409 Ill. App. 3d 302, 315 (2011)). By failing to object to each of Hampton's references to defendant's alleged possession of a gun, a decidedly inculpatory claim, his trial counsel's performance fell below an objective standard of reasonableness. Thus, defendant has established the first prong of the *Strickland* test.

¶ 79     The second *Strickland* prong examines whether counsel's deficient performance prejudiced defendant's case, making it reasonably probable that the outcome of the trial would

29

have been different but for counsel's error. *Strickland*, 466 U.S. at 687; *Eubanks*, 2021 IL 126271, ¶ 30. Defendant asserts that Hampton's first gun reference would have been stricken if counsel had entered a timely objection because that is what happened when counsel entered an objection to her second gun reference. In the absence of that initial objection, defendant argues that the jury was left with the inference that he possessed a gun shortly before the shootings.

¶ 80　　　　Moreover, defendant alleges that the trial court's subsequent instruction that the jurors were "not to consider that as evidence in any way" was insufficient to mitigate the harm because it was given only after Hampton's second gun reference, leaving her first reference open to their consideration. He adds that the resulting prejudice was likely to have influenced the verdict because the evidence against him was not strong.

¶ 81　　　　In rejecting that argument, the majority maintains that the trial court's limiting instruction after the second gun reference was sufficient to cure the error. *Supra* ¶ 48. In support, it cites *People v. Darr*, 2018 IL App (3d) 150562, ¶ 60, for the proposition that jurors are presumed to follow a limiting instruction that is given once when confronted with similar conduct. That proposition is inapt here, however, because *Darr* is distinguishable on its facts. Indeed, it addresses precisely the opposite sequence of events.

¶ 82　　　　In *Darr*, the court examined the jury's application of a *previously* given limiting instruction to *later* occurrences of similar testimony. That court carefully explained its conclusion that the prior instruction applied to the later testimony as well, stating, "It is reasonable that defense counsel, *going forward*, did not object and seek a limiting instruction each and every time a person testified about what [the minor victim] told them. It is also reasonable that the jury was capable of applying that limiting instruction *to future testimony*." (Emphases added.) *Id.* ¶ 60.

¶ 83    Here, in sharp contrast, the limiting instruction could neither justify nor remedy defense counsel's *prior* failure "to object and seek a limiting instruction." Nothing directed them to apply a later instruction to a prior occurrence that had not received a limiting instruction. Jurors in the instant case would have had to apply the limiting instruction *retroactively* to Hampton's first gun reference *without any direction or prompting by the court* because the plain and ordinary meaning of the language used fails to support that interpretive leap. Indeed, the language used belies the suggestion that a reasonable juror would have concluded the instruction was also applicable to Hampton's prior statement. Because the trial court limited only her second gun reference and did not reference the first one at all, the jury would quite logically conclude that the instruction limited its consideration of *only* the second reference.

¶ 84    In an attempt to temporally intertwine Hampton's two clearly dissociated references to defendant's alleged gun possession, however, the majority makes much of the alleged timing of those references, asserting that "a jury is capable of applying an instruction to more than one instance of similar testimony (see *People v. Darr*, 2018 IL App (3d) 150562, ¶ 60), particularly here, where the same testimony is given by the same witness *within a very short time period.*" (Emphasis added.) *Supra* ¶ 47. Notably, the majority previously defined "a very short time period" as "*within three transcript pages* as reflected in the report of proceedings." (Emphasis added.) *Id*. Nothing in the transcript or common life experience, however, supports the speculative conclusion that it took "a very short time" to elicit *three entire pages of trial transcript*.

¶ 85    That conclusion is particularly suspect because, as the majority acknowledges, the State stopped Hampton from continuing her testimony immediately after her first reference to the gun, stating, " 'Okay. Let me—let me slow you down,' " before "then [going] through the events

31

more thoroughly." *Supra* ¶ 11. The State's deliberate efforts to slow down Hampton's rendition of the events belies the majority's declaration that Hampton again referred to the alleged gun "within a very short time period." Instead, the time lapse that would have naturally occurred between the two events under those circumstances was far more likely to have led the jury to conclude that the limiting instruction given after her second reference had absolutely no connection with the first reference several minutes earlier.

¶ 86        Then, after defense counsel objected to Hampton's second gun reference, the trial court proceeded to strike "it." After offering a one-sentence explanation of his rationale, the judge told the jury, "So when I say strike *it*, that is you're not to consider *that* as evidence in any way." (Emphases added.) When the plain meaning of those words is read naturally and in context, the court's usage of "it" and "that" restricted the application of the limiting instruction to Hampton's second hearsay reference because "it" was the only instance objected to by defense counsel and ruled on by the court. Nothing in the court's rationale or the instruction would have conveyed to a reasonable jury that the same limitation was to be applied to Hampton's prior reference, which was never objected to or stricken.

¶ 87        Although the majority focuses on the purportedly broad meaning of the words "in any way" in the trial court's instruction, those words must also be read in proper context. See *supra* ¶¶ 46-48. Here, they were associated solely with Hampton's second hearsay reference, barring jurors from considering that specific reference for any purpose. Thus, while the jurors were broadly instructed not to use the second hearsay reference "in any way," they were never instructed to apply the same limitation to Hampton's prior hearsay reference. The trial court's limiting instruction did not cure the error that occurred when defense counsel failed to object to Hampton's first hearsay gun reference.

32

¶ 88       Without other direct evidence showing that defendant fired a gun at the victims, the State relied heavily on the testimony of his accomplice, Lupe Torres. Torres's testimony, however, was inherently suspect because it was presented in exchange for a highly favorable plea deal with the State, raising questions about his credibility. Little other evidence tied defendant to the shootings. He did not confess to police, consistently maintaining his innocence. The shooting victims were unable to identify him as the shooter, and the forensic evidence also failed to establish that connection.

¶ 89       Although the jury heard a recorded conversation between defendant and Latesia Wilson, it, too, failed to prove that he fired the shots. The recording simply confirmed that the men went to the Burger King to find "David," who had allegedly attacked one of defendant's friends earlier in the day. Even though defendant told Wilson that "[w]e got our licks back anyway," nothing suggested that that meant he shot at anyone, and defendant never admitted to firing a gun.

¶ 90       The remainder of the State's evidence was also far from compelling. Detective Zingre testified that she saw defendant in a nearby lot after being dispatched to investigate a report of shots fired. While she mentioned that defendant's presence there was "uncommon" because the lot was in rival gang territory, his mere presence in a particular part of town is insufficient to establish guilt. Detective Zingre's testimony clearly shows that she was not present when the shooting occurred and failed to offer any testimony suggesting that defendant pulled the trigger. Similarly, Kankakee County juvenile probation officer Spears corroborated other testimony that defendant was briefly at the Burger King prior to the shootings, as well as Torres's testimony that he picked up defendant and two other men from the restaurant in a small, red, four-door car. None of that testimony, however, indicates that defendant was the one who fired the shots.

¶ 91      The evidence in the record tending to show that defendant was the shooter was far from overwhelming. Based only on that evidence, the impact of counsel's failure to object to Hampton's initial hearsay statement tying defendant to a gun shortly before the shootings is unclear, although it appears that but-for defense counsel's error in failing to object to that testimony, it was reasonably probable that he would have been acquitted. Because the question is a close one, that possibility is seriously troubling.

¶ 92                                B. Other Crimes Evidence

¶ 93      Turning next to the issue of whether it was reversible error to admit evidence of defendant's other crimes and bad acts, defendant argues that admitting extended trial testimony detailing his pretrial attempts at witness-tampering on top of a certified copy of his convictions for that same conduct was plain error because its probative value was far outweighed by its prejudicial effect on the jury. Prior to trial, the court ruled that the other convictions could be *admitted for the limited purpose of showing defendant's state of mind and consciousness of guilt*. Defendant also contends that his trial counsel's failure to preserve the other crimes issue through the requisite objections and posttrial motions constituted ineffective assistance. Because defendant failed to object to the admission of the evidence both at trial and in a timely posttrial motion, he must rely on plain-error review. The admission of the other crimes evidence is reviewed for an abuse of the trial court's discretion. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

¶ 94      Here, the record shows that the trial court permitted the State to introduce evidence of defendant's guilty plea to two counts of witness intimidation based on his attempts to influence the testimony of Torres and K.B., including a certified copy of his conviction for two counts of

34

harassing a witness, and to publish his guilty plea to the jury. The State explained the contents of the certified copy of the conviction to the court, stating:

"[I]t is a certified copy of a conviction pursuant to a plea of guilty by the defendant as to Counts I and III of the Indictment. Count I, which is that on or between October 28th—I'm sorry—that on or between the 28th day of August, 2017, and the 6th day of December, 2017, in the County of Kankakee, State of Illinois, said defendant, Marquise Sabbs, committed the offense of harassment of a witness, in violation of Chapter 720, Paragraph 5/32-4a(a) of the Illinois Compiled Statutes, in that said defendant, who, with intent to harass or annoy Lupe Torres, an inmate at Jerome Combs Detention Center who was serving as a witness, or who may be expected to serve as a witness in a pending legal proceeding, that being Case No. 17 CF 524, because of the testimony or the potential testimony of Lupe Torres, communicated directly with Lupe Torres in such a manner as to produce mental anguish or emotional distress, in that Marquise Sabbs had other inmates deliver kites or notes and affidavits to Lupe Torres to try and change Lupe Torres' testimony.

Count III, the plea was to—that on or about the 28th day of August, 2017, and the 6th day of December, 2017, in the County of Kankakee and State of Illinois, said defendant, Marquise Sabbs, committed the offense of harassment of a witness, in violation of Chapter 720, Paragraph 5/32-4a(a) of the Illinois Compiled Statutes, in that said defendant, an inmate at the Jerome Combs Detention Center, who, with intent to harass or annoy K.B., a minor who was serving as a witness or who may be expected to serve as a witness in a pending legal proceeding, Case No. 17 CF 524, because of testimony or potential testimony of the K.B., communicated directly—communicated

35

indirectly with Shernica Johnson, the mother of K.B., in such a manner as to produce mental anguish or emotional distress to Shernica Johnson, in that Marquise Sabbs had other associates contact Shernica Johnson to try to influence K.B.'s testimony."

¶ 95        Defendant argues that, although the publication of his convictions and charges "was arguably proper, for the purpose of showing his consciousness of guilt," citing *People v. Begay*, 377 Ill. App. 3d 417, 421-22 (2007), the additional in-person testimony elicited from Torres and K.B.'s mother, Shernica Johnson, provided descriptions of those attempts that were redundant and more prejudicial than probative of his guilt in the instant case.

¶ 96        When considering the admission of other crimes evidence, courts must be cautious to avoid effectively creating a trial-within-a-trial on a matter that is purely collateral to the offense at issue. *People v. Nunley*, 271 Ill. App. 3d 427, 432 (1995). "[C]ourts are especially wary of accumulation, given the high danger of undue prejudice inherent in such evidence." *People v. Maya*, 2017 IL App (3d) 150079, ¶ 71. "This court has specifically held that other-crimes evidence is admissible '*if it is part of a continuing narrative of the event giving rise to the offense or, in other words, intertwined with the offense charged.*' " (Emphasis added.) *People v. Abernathy*, 402 Ill. App. 3d 736, 751 (2010) (quoting *People v. Thompson*, 359 Ill. App. 3d 947, 951 (2005)). To determine whether the State's other crimes evidence was unduly redundant and prejudicial, this court must examine the substance of that evidence.

¶ 97        The convictions for witness harassment that were published to the jury here involved vastly different conduct from that at issue in defendant's trial. At trial, defendant faced two counts of attempted first-degree murder, two counts of aggravated battery with a firearm, and aggravated discharge of a firearm. In contrast, defendant pled guilty in Count 1 of the witness harassment charges to intentionally trying to influence Torres's testimony by creating mental

36

anguish or emotional distress through harassment by "[having] other inmates deliver kites or notes and affidavits to Lupe Torres." His guilty plea to Count III of the harassment charges acknowledged that he intentionally sought to influence K.B.'s testimony by creating mental anguish or emotional distress by "[having] other associates contact Shernica Johnson," K.B.'s mother. In its pretrial ruling, the trial court admitted those convictions for the limited purposes of showing defendant's consciousness of guilt and state of mind. They were never intended to give the jury an opportunity to retry defendant on the witness harassment charges. The broad descriptions of defendant's culpable conduct in harassing the witnesses published to the jury in his convictions and plea provided jurors with all the context needed to connect those offenses with the instant case. The State did not stop there, however.

¶ 98        The State also elicited trial testimony from Torres and Johnson that was both cumulative and redundant, generally revisiting: (1) Torres's account of the harassment he experienced while in jail, detailing defendant's attempts to influence his testimony; (2) the substance of the notes and affidavits defendant sent to Torres; and (3) Johnson's testimonial description of how two men closely tied to defendant made not-so-veiled threats of violence in an effort to scare K.B. into refusing to testify. Both Torres and Johnson provided exceedingly detailed accounts of the factual basis underlying defendant's harassment convictions. That degree of detail was far more than was necessary to provide jurors with a proper context to show defendant's state of mind and possible consciousness of guilt, the limited purposes for which the other crimes evidence was admitted.

¶ 99        Moreover, after Chad Kolitwenzew, Chief of Corrections for the Kankakee County Sheriff's office, established the foundation for admission of a disc of recorded phone conversations defendant placed while in jail and an associated call detail report, the State further

37

amplified the potential for undue prejudice by presenting 20 minutes of those recorded clips to the jury. The clips detailed in defendant's own voice his repeated attempts to influence witnesses who could have testified against him. In those clips, defendant directly implicated himself in the witness harassment charges. For example, he was heard to say, "It wasn't him (some other person) that snitched, it was some little girl with the initials KB." In addition, he told another inmate that "[t]he only thing I got to do is get to the little girl." On another call, defendant stated that he had heard "through the grapevine" that "it was Lupe [Torres]," and later added, "Try to get him to change his statement" while referring to someone he called "dude." Defendant also offered suggestions on how to alter the prospective testimony, such as, "Say that me and him got into it, type sh**. And just change his statement. That way when I show up in court there's going to be a reasonable doubt. Like, why the f*** you changing your statement?" In addition, he directed, "As a matter of fact text Nishaya right now your number and write, if Ashley will let you, tell Lupe to call you." Finally, he instructed, "Tell him Loko understands you have to do what you have to do, but just change your statement, and be like 'he wasn't with you' type sh**."

¶ 100    In later calls, defendant was asked, "What you want me to tell 'em?", and he answered, "Don't say it's me talking. You gotta say, 'Man, bro, woo woo, that sh** that happened with your little brother and them, that was all Lupe, that wasn't Loko—he ain't had sh** to do with that. Lupe and Loko got into it so Lupe's holding a grudge on Loko' *** Have them come to court and say they seen who it was, and it was Lupe and not me." He said, "Be like, Loko wasn't even with him that day. Loko was out of town, he wasn't even with him. They got into it, and he was holding a grudge on Loko." Defendant also explained that "I need them to come to court. Tell them, like, when it's time to come to court, can they come up there and let them know, like,

they know what they've seen—it was Lupe, I ain't had sh** to do with it, type sh**." On October 31, defendant stated that "I need you all to stand up on that for me. Because when it's time to go to trial, I gotta make sure they don't even come to court for me, or if they do, they gotta set the record straight, like it wasn't me type sh**." In total, the State admitted about 20 minutes of recorded calls that closely documented defendant's repeated attempts to influence the testimony of K.B., Torres, and other potential witnesses. Moreover, the jury was able to review those recordings while deciding defendant's fate in this case. That evidence was presented to the jury despite it already having been made aware of his convictions on two counts of witness harassment.

¶ 101    The unduly comprehensive additional other-crimes evidence could not legitimately be deemed to constitute " 'part of a continuing narrative *of the event giving rise to the offense*' " where the only "offense[s]" properly before the jury involved attempted murder, aggravated battery, and aggravated discharge of a firearm. (Emphasis added.) *Abernathy*, 402 Ill. App. 3d at 751 (quoting *Thompson*, 359 Ill. App. 3d at 951). Defendant's much later attempts to harass potential witnesses did not "giv[e] rise" to those charges. Indeed, the State itself recognized both the substantive difference in the two sets of charges and the disconnect between the conduct that was at issue in each of them when it chose to try defendant separately on the intimidation counts in the earlier proceedings. By eliciting extensive testimony on minute details of the harassment charges, the State effectively created a mini-trial of defendant's guilt on those *earlier* charges after he had already pleaded guilty, contrary to the intent of our state law and the trial court's pretrial ruling. See *Nunley*, 271 Ill. App. 3d at 432 (stating that courts will not admit other crimes evidence that creates a trial with a trial). Read as whole, the detailed trial testimony about defendant's harassment of the witnesses, on top of the publication of his convictions and plea,

39

took on an importance that was independent of the evidence offered on the charges for which he was actually being tried, effectively creating an additional, and highly improper, basis for jurors to convict him.

¶ 102    The sheer volume of highly prejudicial other crimes evidence provided by Torres, Johnson, and the recorded phone clips did far more than simply provide "context" for defendant's harassment convictions. It offered a multitude of opportunities for jurors to convict defendant of the gun and attempted murder charges at issue based, not on the facts related to those crimes, but rather on his prior bad acts and character. The potential for undue prejudice was exacerbated by the high degree of detail in the other crimes testimony presented to the jury. Together, those factors strongly suggest that, in light of the admission of defendant's prior witness harassment convictions, the prejudicial effect of the other crimes evidence far outweighed its probative value.

¶ 103    Perhaps even more egregiously, however, Shernica Johnson also testified before the jury that the two men who had made threats to prevent her daughter, K.B., from testifying against defendant were also present in the courtroom as she testified at defendant's trial. After she made those statements, the State continued to ask Johnson several questions about where the two men were seated in the courtroom and what they were wearing. During defendant's cross-examination of Johnson, that line of questioning continued, with counsel repeatedly asking her to identify the two men and provide their names for the jury, despite her insistence that she did not personally know them. When confusion arose about the names of the men who had attempted to influence K.B.'s testimony, defense counsel requested the trial court's involvement:

"MR. RIDGE [(DEFENSE COUNSEL)]: Do you have that name? Well, Judge, I'm just wondering if we can simplify this and have these gentlemen—two gentlemen stand up and tell us their names?

THE COURT: You want them to do that, that's fine.

MR. RIDGE: I do.

THE COURT: Sure. Yeah."

¶ 104    What followed was an extended series of sometimes confusing requests and questions with the three men seated at the back of the courtroom in a lengthy attempt to identify them. After many attempts, the men's identities were revealed to include at least one of the men Johnson identified as having previously threatened her and K.B. in a courtroom. Critically, all these events took place in full view of the jury.

¶ 105    The three men remained seated in the courtroom during the rest of Johnson's testimony about the threats defendant initiated against K.B. Only after the conclusion of her testimony did the court take a recess. During that time, the trial judge had the three men removed and "banned from the courthouse." When the jury was brought back into the courtroom, it was not informed that the men had been removed, leaving jurors to potentially speculate about their own safety in light of being observed by men who had previously been involved in witness tampering at defendant's request. The extended in-court discussion about the men's presence also greatly emphasized Johnson's testimony addressing defendant's attempts to frighten K.B. into refusing to not testify against him. The highly unusual nature of those events also undoubtedly made that testimony much more memorable to the jury.

¶ 106    "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith ***." Ill. R. Evid. 404(b) (eff. Jan. 1,

41

2011). In *People v. Thigpen*, 306 Ill. App. 3d 29, 36 (1999), the court explained the potential risk to the fairness of the trial process. "The prosecution may not introduce such evidence to support the inference that the defendant committed the offense charged because he or she has a propensity to commit crimes. The danger is that the jury might convict the defendant simply because it feels he or she is a bad person." For that reason, evidence of other crimes may generally be admitted only "to prove motive, intent, identity, absence of mistake, modus operandi, or any other relevant fact other than propensity." *People v. Vannote*, 2012 IL App (4th) 100798, ¶ 37.

¶ 107        Here, the trial court entered a pretrial ruling that ostensibly permitted the State's introduction of the other crimes evidence for *only* the limited purposes of showing defendant's state of mind and consciousness of guilt. *The jury instructions, however, did not limit jurors' consideration to those purposes*. Instead, jurors were instructed that "[t]his evidence has been *received on the issues of the defendant's intent, motive, knowledge, and state of mind* and may be considered by you only for that limited purpose—or those limited purposes." Thus, defendant was denied any protection from the risk of undue prejudice created by the additional other crimes evidence that could have arguably been provided by a more limited jury instruction. In sum, the volume and detail of the other crimes evidence admitted, as well as the trial court's decision to permit the men in the gallery to be discussed and questioned in the presence of the jury, made the other crimes evidence far more prejudicial than probative of defendant's guilt in the victims' shootings.

¶ 108        In deciding whether the probative value of the additional other crimes evidence was outweighed by the undue prejudice it likely engendered against defendant, this court must review all the testimony pertaining to defendant's harassment of Torres and K.B., as well as the

recorded clips initiating those threats. In my view, the other crimes evidence effectively created a highly improper mini-trial of defendant's guilt on the witness harassment charges, with the in-court colloquy involving the three men in the gallery tipping the balance even further toward finding the evidence unduly prejudicial and likely to have improperly influenced the verdict here.

¶ 109      Accordingly, under the unique facts of this case, I conclude that the trial court abused its discretion in admitting the additional other crimes evidence, in allowing the State's unbridled expansion of its use, and in instructing the jury on its consideration of that evidence. Because defendant did not object to the admission of that evidence at trial or in a posttrial motion, however, defendant must also overcome the hurdle of establishing plain error.

¶ 110      C. Plain Error

¶ 111      In Illinois, our courts recognize two types of plain error. To establish first-prong plain error, a defendant must demonstrate that the evidence was closely balanced, the error was "clear or obvious," and that the error likely changed the outcome of the trial. Second-prong plain error requires proof that the error was so serious that it either affected the fairness of the proceeding or undermined the integrity of the judicial process. *People v. Mudd*, 2022 IL 126830, ¶ 22.

¶ 112      In reviewing defendant's ineffective assistance of counsel claim, I initially determined that "the evidence establishing defendant as the shooter was far from overwhelming." *Supra* ¶ 23. I remained "troubled" by the lingering possibility that defendant would have been acquitted but for his counsel's failure to object to Daliesa Hampton's hearsay testimony, finding "the question to be a close one." *Id*. In light of the trial court's erroneous admission of the highly prejudicial other crimes evidence, I am even more troubled.

¶ 113      When viewed in the aggregate, even trial errors that may not merit reversal when viewed individually may create a cumulative impact that is sufficient to deprive a defendant of the right

to a fair trial. *People v. Simmons*, 342 Ill. App. 3d 185, 191 (2003). In those instances, fundamental principles of fairness and due process mandate that the defendant's conviction be overturned and the cause remanded to the circuit court for a new trial. *Id*. The instant case is one of those instances. When the improperly admitted hearsay and other crimes testimony is removed from consideration, the evidence against defendant is indeed closely balanced. While no defendant is entitled to a perfect trial, the defendant here was undoubtedly entitled to a *fair* trial. *People v. Bull,* 185 Ill. 2d 179, 214 (1998). Because the cumulative impact of the evidentiary errors committed at trial created a constitutionally unacceptable risk that defendant received an unfair trial and clouded the jury's verdict, I would hold that defendant has established first prong plain error and reverse his convictions, remanding for a new trial.

¶ 114       Because the issue of improper jury polling would be unlikely to arise again on remand, I find it unnecessary to address defendant's arguments on whether the trial court's failure to poll all twelve jurors violated his fundamental rights. In sum, for all the reasons I have set out, I respectfully dissent from the majority's decision.